USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/2/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                        :

JAMIA FERNANDES, *et al.*,            :

                                          :

                     Plaintiffs,  :          1:22-cv-8805-GHW

                                          :

               -v -                :     MEMORANDUM OPINION &
                                          :           ORDER

CENTESSA PHARMACEUTICALS PLC, *et al.*,  :

                                          :

                                          :

                  Defendants.  :

                                          :
-------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

Centessa Pharmaceuticals PLC ("Centessa" or the "Company"), a pharmaceutical research and development company, worked to develop a drug called lixivaptan to treat autosomal dominant polycystic kidney disease ("ADPKD"), which is a leading cause of kidney failure in the United States. When Centessa set out to do so, there was only one other FDA-approved drug on the market to treat ADPKD: tolvaptan. But tolvaptan has its problems. Namely, after three months, some ADPKD patients who take tolvaptan experience liver toxicity. As a result, the drug is highly regulated and viewed as inaccessible by many suffering from ADPKD. Lixivaptan seemed promising at first: early studies suggested that it might be able to treat ADPKD without some of the adverse effects seen in patients taking tolvaptan.

But the early results turned out to be too good to be true. One of the ADPKD patients taking lixivaptan in a clinical study came to experience liver chemistry abnormalities—the exact adverse effect that beset tolvaptan, which Centessa hoped lixivaptan would avoid. As a result, Centessa discontinued clinical development of the drug for ADPKD patients. The same day that Centessa announced the discontinuation due to the adverse effects suffered by one of the patients in its study, the price of Centessa's stock fell nearly 28%.

Plaintiffs—who purchased Centessa stock at its IPO, and held it following the press release announcing lixivaptan's discontinuation—brought this action, alleging that the defendants violated the Securities Act through alleged misstatements and omissions in Centessa's Registration Statement. Namely, Plaintiffs alleged that the defendants failed to disclose that some of the studies and models Centessa had relied on in hypothesizing the potentially relatively favorable safety profile of lixivaptan (in comparison to tolvaptan) were, in Plaintiffs' view, "too short" in duration, utilized the "wrong" population, or failed to account for an allegedly key variable.

Specifically, Plaintiffs complained that first, some of the underlying studies on tolvaptan did not show critical levels of enzyme elevation until three months in, yet some of Defendants' lixivaptan studies lasted for less than three months. Second, as alleged, earlier tolvaptan studies had shown liver enzyme elevation only in patients with ADPKD, but some of Defendants' lixivaptan studies involved patients who did not have ADPKD. Third, Defendants' lixivaptan modeling allegedly did not account for a key variable that, at least in some tolvaptan studies, was found to drive drug induced liver disease ("DILI"). Fourth, Plaintiffs alleged that Defendants failed to disclose, at the time of the IPO, that Centessa was experiencing enrollment issues in its Phase 3a trial for lixivaptan. Plaintiffs contend that Centessa's Registration Statement therefore contained false and/or misleading statements, or material omissions, insofar as (1) Defendants allegedly misstated lixivaptan's comparative safety profile relative to that of tolvaptan, and (2) they allegedly overplayed lixivaptan's clinical and commercial prospects, given that the underlying studies and models upon which Defendants' views were founded were—in Plaintiffs' view—flawed.

But Plaintiffs' allegations do not read the Registration Statement in context, and Defendants did not overplay their hand. Far from it: nearly every one of Plaintiffs' complained-of statements is a forward-looking opinion of the Company's "beliefs" and hypotheses about the drug. And the Registration Statement, when read as a whole, clearly bespeaks caution to the relevant risk—not that any study underlying the Company's beliefs about the drug's prospects was theoretically imperfect

2

(although the statement warns of that risk too), but that the drug itself very well may fail to secure a safety profile that outperforms tolvaptan's, and that its development may be discontinued as a result. Centessa dedicated about 80 pages of its Registration Statement to articulating all the things that may have gone wrong, including what actually did.

Because the alleged misstatements or omissions, when read in context, are not likely to have misled a reasonable investor, Defendants' motion to dismiss is GRANTED.

## I.    BACKGROUND

Centessa, a pharmaceutical research and development company, was founded in October of 2020.  Dkt No. 44 (the "FAC") ¶¶ 2, 30.  Its American Depository Shares ("ADSs") trade on the NASDAQ.  *Id.* ¶¶ 1, 13.  The Company acquired eleven biotechnology companies in early 2021.  *Id.* ¶ 31.  Its "portfolio was a composite of immuno-oncology therapies and therapies intended to treat . . . diseases that are technically considered rare but have relatively high incidence rates."  *Id.* ¶ 32.

On April 21, 2021, Centessa filed its Registration Statement on Form S-1 with the Securities and Exchange Commission ("SEC") in connection with its initial public offering ("IPO").  *Id.* ¶ 3. "[A]fter several amendments," the Registration Statement was approved by the SEC on May 27, 2021.  *Id.*; *see also* Dkt No. 73-1 (Centessa's Form S-1/A, or the "Registration Statement") at 2.[1]  The Registration Statement emphasized Centessa management's "'relentless focus on data-driven decision making' and 'judicious capital allocation' as the 'core' of an asset-centric model that allows the Individual Defendants to make asset-allocation decisions quickly, thereby differentiating Centessa from competitors."  FAC ¶ 37.  The Company "operates by the motto 'fail fast, and fail early,' which purportedly allows the Company to 'expeditiously terminate programs when the data

---

[1] The Registration Statement is integral to the complaint and properly considered in evaluating the motion to dismiss. *See Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020).  And although Plaintiffs take issue with some of Defendants' other exhibits attached to a declaration supporting their motion to dismiss, *see* Dkt. No. 77 (the "Opp'n") at 34–35 (asking the Court to "strike or decline to consider" Exhibits 4 and 5), Plaintiffs did not object to the consideration of Exhibit 1, the Form S-1/A.  Plaintiffs' opposition itself refers to this form as the "Registration Statement."  *Id.* at x, 1 n.1.  In addition, page numbers in this opinion refer to the native document's pagination unless otherwise noted.

do not support advancing a program;'" and this motto "communicated to investors that Centessa would not continue to invest in programs and product candidates without high potential for successful launch." *Id.* In the Registration Statement, Centessa summarized its expected allocation of net IPO proceeds, attributing $110 million to lixivaptan, constituting "the largest individual investment by nearly a factor of two." *Id.* ¶¶ 34–35.

Centessa conducted its IPO on or about May 28, 2021, issuing 16.5 million shares to the public at $20.00 per ADS. *Id.* ¶ 3. Although Centessa had sixteen drug programs in its pipeline at the time of its IPO, *id.* ¶ 33, "Centessa's most important drug candidate, lixivaptan, was one of only four drug candidates that they had in development and its only drug to reach Phase 3 clinical development," *id.* ¶ 4. Lixivaptan aimed to treat ADPKD, a leading cause of kidney failure in the United States. *Id.*; *see also id.* ¶ 39. Although there is currently "no cure for ADPKD," there is "one FDA-approved drug indicated to slow kidney function decline in ADPKD patients—JYNARQUE (tolvaptan)." *Id.* ¶ 40. Tolvaptan, however, "carried a significant risk of liver toxicity in ADPKD patients." *Id.* ¶ 41. In the Registration Statement, Centessa asserted that lixivaptan may have a differentiated safety profile from that of tolvaptan. The Company stated: "We believe that lixivaptan may offer similar therapeutic activity in treating ADPKD as compared to tolvaptan while avoiding DILI associated with tolvaptan use in this patient population." *Id.* (quoting the Registration Statement). As alleged, this differentiated safety profile "was key to the marketability— and profitability" of lixivaptan and "formed the basis for a significant portion of the valuation of Centessa" at the time of the IPO. *Id.* ¶¶ 41–42.

Jefferies, in a June 2021 report, estimated that "nearly 80% of Centessa's value depended on the successful market differentiation of lixivaptan from tolvaptan." *Id.* ¶ 44. And a Morgan Stanley report from the same month indicated that "a superior liver safety profile compared to tolvaptan would make lixivaptan a 'disruptive treatment for ADPKD,'" given the "'unfavorable safety profile' of [tolvaptan] . . . . Management's intention is to commercialize . . . lixivaptan, that leverages the

[same mechanism used to treat APDKD as in tolvaptan] *without the risk of severe liver injury or death.*'"  *Id.* ¶ 45 (quoting the June 2021 report, emphasis in complaint).

### A. Alleged Data Issues

Plaintiffs allege that the studies and models cited in the Registration Statement failed to support the proposition that lixivaptan was likely to have a differentiated, more favorable liver safety profile relative to that of tolvaptan.  *Id.* ¶¶ 5, 46.  In the Registration Statement, "Defendants stated that their claim was based on data from:  (1) legacy lixivaptan studies in non-ADPKD cohorts conducted by Cardiokine [the 'Legacy Studies'], (2) results from DILIsym, a quantitative systems toxicology modeling tool [the 'Simulations'], and (3) Phase 2 studies conducted by Palladio prior to the IPO [the 'Phase 2 Studies']—purportedly noting that no signs of liver toxicity were observed in any of the above studies and modeling."[2]  *Id.* ¶ 46.

Plaintiffs contend that Defendants misled investors regarding lixivaptan's relative safety profile and clinical and commercial prospects because Defendants based their hypotheses about the drug in the Registration Statement on studies and models that Plaintiffs contend were inadequate.  In short, Plaintiffs assert that the lixivaptan studies and models were either (1) "too short in duration to yield meaningful results," or (2) "involved the wrong patient population," such that the studies and models were unable "to show whether lixivaptan would cause liver injury in ADPKD patients *per se* . . . ."  *Id.*  These critiques of Defendants' lixivaptan studies and models are rooted in Plaintiffs' understanding of earlier-conducted tolvaptan studies.  *See id.* ¶¶ 47–51.

The Court begins with an overview of the studies and their problems, as alleged, and then proceeds to the challenged statements.

---

[2] *See* FAC ¶ 38 ("At the time of the IPO, lixivaptan was being developed by Centessa's Palladio subsidiary . . . ."); Opp'n at 3 (describing Palladio as "Centessa's subsidiary" (citing FAC ¶¶ 38–39)).

#### 1.   The Tolvaptan Studies

Plaintiffs allege that "[n]o evidence of liver toxicity was observed in any of the" tolvaptan trials that treated patients who did not have APDKD. *Id.* ¶ 47. And once clinical trials were conducted "to investigate the use of tolvaptan for the treatment of ADPKD," at least one tolvaptan study found elevated liver enzymes. *Id.* ¶ 48. But "*none of the tolvaptan-associated signs of injury appeared within the first three months of exposure.*" *Id.* (emphasis in original). That same three-month delay was shown in another clinical study of tolvaptan on ADPKD patients in 2010. *Id.* ¶ 49. The FDA subsequently determined, in 2013, that tolvaptan "should not be used for longer than 30 days or in patients with liver disease." *Id.* ¶ 50. Five years later, the FDA approved the marketing of tolvaptan for ADPKD, but the FDA required that the drug be sold with a warning for serious and potentially fatal drug induced liver disease due to the elevated risk of liver toxicity. *Id.* ¶ 51; *see also id.* (noting that Centessa stated in the Registration Statement that "[l]iver toxicity is cited as a major deterrent to using tolvaptan for many patients").

#### 2.   The Lixivaptan Legacy Studies

In the Registration Statement, Defendants cited the lixivaptan Legacy Studies in non-ADPKD cohorts as the studies "providing 'the most useful safety data for the current development program in ADPKD.'" *Id.* ¶ 52 (quoting the Registration Statement at 190). But Plaintiffs allege that these studies—which showed no signs of liver toxicity in non-ADPKD populations—"did not support the safety profile of lixivaptan when compared to tolvaptan in ADPKD populations." *Id.* This is because the studies (1) "were too short in duration," exposing patients to the drug for under three months, with a "mean exposure duration" of 27.5 days, and (2) "targeted the wrong population," namely, non-ADPKD patients. *Id.* ¶¶ 52–53. As alleged, the Legacy Studies "did not show any differentiated safety data from the non-ADPKD tolvaptan trials—both vaptans had the same number of liver toxicity adverse events:  zero." *Id.* ¶ 53.

### 3. The Lixivaptan Phase 2 Studies

Plaintiffs contend that "[t]he Phase 2 trials conducted by Palladio also did not provide any data upon which Defendants could reasonably rely to evaluate the comparative safety profile of lixivaptan." *Id.* ¶ 60. One of the Phase 2 Studies enrolled 31 ADPKD patients, who received treatment for seven days, which Plaintiffs contend is "far too few to provide rigorous data and far too short to show evidence of liver toxicity." *Id.* And "[a]lthough the study was partly designed 'to guide appropriate lixivaptan dosing recommendations,' in the Registration Statement, Defendants cited the results as supportive of their claims regarding the purported positive safety profile of the drug, noting that the data from [one of the Phase 2 Studies] showed 'a good tolerability profile and *AEs [adverse events] that are consistent with previous [non-ADPKD] studies.*'" *Id.* (quoting the Registration Statement) (emphasis in complaint). Plaintiffs contend that the study populations—31 patients for one of the Phase 2 Studies, and one patient for another—were also "too small." *See id.*

### 4. The Lixivaptan DILIsym Simulations

In addition, Plaintiffs contend that the "DILIsym simulations cited by Defendants in the Registration Statement as supportive of lixivaptan's differentiated safety profile were . . . unreliable," for three reasons. *See id.* ¶ 55. First, Plaintiffs allege that "the DILIsym lixivaptan modeling did not account for adaptive immune responses," a "key driver of tolvaptan-induced DILI." *Id.* ¶ 56. Plaintiffs cite a 2019 article in CLINICAL AND TRANSLATIONAL SCIENCE, in which Paul B. Watkins, the "Director of the DILIsym Initiative and Chairman of the DILIsym Scientific Advisory Board, noted that '[i]t is increasingly appreciated that delayed, idiosyncratic hepatotoxicity is frequently the result of an adaptive immune attack on the liver,' and that '*until adaptive immune mechanisms are incorporated into DILIsym, the model cannot be considered reliable to assess idiosyncratic DILI liability.*'" *Id.* (quoting the article) (emphasis in complaint). Plaintiffs also cite a 2020 study, published in PHARMACEUTICAL RESEARCH, which "observ[ed] that '[i]t has been proposed that an adaptive immune-mediated attack plays a role in tolvaptan-mediated toxicity.'" *Id.* ¶ 57 (quoting the article).

Second, Plaintiffs argue that the Simulations were unreliable because of their duration and populations. As alleged, the simulated populations "were 'created based on normal healthy volunteer studies,'" such that "ADPKD patients were not represented." *Id.* ¶ 58. And again, "the tolvaptan trials demonstrated an increased risk of DILI only in study participants with ADPKD, but not in non-ADPKD subjects." *Id.* Plaintiffs contend that "DILIsym's predictions, therefore, were inapplicable to ADPKD." *Id.*; *see also id.* (quoting a blog post in which Mr. Watkins allegedly wrote that the "DILIsym prediction that . . . lixivaptan is safer for the liver than tolvaptan *has not been tested.*" (emphasis in complaint)). As for the Simulations' duration, Plaintiffs contend that "the DILIsym lixivaptan simulations were too short" because "the lixivaptan simulated exposure duration was only . . . 84 days," whereas "the duration modeled in the tolvaptan DILIsym simulations was 180 days . . . ." *Id.* ¶ 59. And the human tolvaptan trials allegedly did not show elevated liver enzymes until 90 days of exposure. *Id.* Thus, Plaintiffs argue that the Simulations "did not support the claim that lixivaptan was less likely to cause liver toxicity than tolvaptan in ADPKD subjects." *Id.*

Given these alleged defects, Plaintiffs conclude that Defendants' statements about (a) the safety profile and (b) the clinical and commercial prospects of lixivaptan were "false when made and lacking any reasonable basis," *id.* ¶ 46, because Defendants—Plaintiffs argue—improperly relied on these sources and failed to disclose "critical facts about the[] studies" and models, *id.* ¶ 5, including "confounding data from studies involving competitor drug tolvaptan," *id.* ¶ 46.

### B. Alleged Recruitment Challenges

In addition to the alleged data issues, Plaintiffs allege that Centessa struggled to recruit participants for its Phase 3a ALERT safety study (the "ALERT Study"), and that Defendants failed to disclose these enrollment challenges in the Registration Statement. *Id.* ¶¶ 61–62. The Company began recruitment for this study in September 2020, and the study was designed "as an open label, repeat dose study where up to 50 patients would be enrolled and treatment would be provided . . .

8

for up to 52 weeks." *Id.* ¶ 61.  The Registration Statement reported that the first patient was dosed

in November 2020.  *Id.* ¶ 62.  But, Plaintiffs allege, "as Defendants later disclosed, only two subjects

had received their first lixivaptan dose at the time of the IPO—approximately nine months after the

enrollment began for the ALERT study."  *Id.*; *see also id.* ¶ 7 (alleging that at this time, "Centessa had

only two of its targeted fifty patients enrolled in the Phase 3a ALERT trial").

### C.  The Challenged Statements

With this overview in mind, the Court turns to the challenged statements.  Plaintiffs argue

that two categories of statements made in connection with the Centessa IPO were "false and/or

misleading:"  (a) statements about lixivaptan's safety profile, and (b) statements about the drug's

clinical and commercial prospects.  *See id.* ¶ 63.

### 1.  Safety Profile Statements

Statements regarding "the purported differentiated safety profile of lixivaptan as compared

to tolvaptan" in the Registration Statement, which Plaintiffs contend were based on "non-applicable,

unreliable data," include the following eight statements:

> "We believe lixivaptan has the potential to deliver similar efficacy benefits to tolvaptan, which is currently indicated for a subset of ADPKD patients, with a differentiated safety and tolerability profile that may enable access and therapeutic benefit to a broader set of patients."

 *Id.* ¶ 64 (quoting Registration Statement at 4–5) (emphasis in complaint) ("Statement No. 1").

> "We believe the potential of lixivaptan in ADPKD is supported by data to date, which includes extensive data from a quantitative-systems toxicology modeling tool, clinical development in a different indication as well as preclinical and clinical studies in ADPKD."

*Id.* (quoting Registration Statement at 134, 181) (emphasis in complaint) ("Statement No. 2").

> "We believe that lixivaptan may offer similar therapeutic activity in treating ADPKD as compared to tolvaptan while avoiding the DILI associated with tolvaptan use in this patient population."

*Id.* (quoting Registration Statement at 182) (emphasis in complaint) ("Statement No. 3").

> "Lixivaptan's development program for ADPKD builds on a historical, extensive development program conducted by our licensors in investigating lixivaptan for the

9

treatment of hyponatremia.  This work included 36 completed clinical studies in which more than 1,600 subjects were dosed with lixivaptan, the results from which we believe support lixivaptan's activity on key measures believed to be important for ADPKD.  In addition, no lixivaptan-related liver toxicity was noted in a safety assessment conducted for potential hepatotoxicity in this previous development program.

Prior to administering lixivaptan to ADPKD patients, Palladio studied lixivaptan's liver safety profile, as compared to tolvaptan, by utilizing DILIsym, a state-of-the art, predictive, quantitative systems toxicology modeling tool developed by the DILIsym Consortium in collaboration with the U.S. FDA and industry partners.  DILIsym representations predicted that lixivaptan is not likely to cause DILI and may be better tolerated than tolvaptan with respect to the mechanisms of liver toxicity currently represented in DILIsym.

*Id.* (quoting Registration Statement at 183) (emphasis in complaint) ("Statement No. 4").

Palladio has completed a Phase 2 clinical trial, designated the ELiSA Study (Evaluation of Lixivaptan in Subjects with ADPKD) . . . .  Lixivaptan was well tolerated at the doses given, with adverse events (AEs) consistent with previous studies in non-ADPKD patients.  No liver toxicity signals were noted.

Palladio has also completed a clinical study in a single subject with intractable pain due to ADPKD who was required to discontinue tolvaptan treatment due to clinically significant abnormalities in serum [ALT], a sign of liver toxicity, on each of three sequential attempts to initiate treatment with tolvaptan.  The patient was subsequently treated with lixivaptan for more than 14 months with no abnormalities in ALT or other liver chemistry tests.

*Id.* (quoting Registration Statement at 183) (emphasis in complaint) ("Statement No. 5").

[W]e believe results from PA-102 [Phase 2 ELiSA Study] suggest that lixivaptan may be a potent vasopressin V2 receptor antagonist . . . with a good tolerability profile and AEs that are consistent with previous studies.

*Id.* (quoting Registration Statement at 186) (emphasis in complaint) ("Statement No. 6").

Palladio considers the legacy studies in healthy volunteers, including PK studies, drug interaction studies, a renal insufficiency study and a thorough QTc study, to provide the most useful safety data for the current development program in ADPKD.  Lixivaptan was generally well tolerated in these studies without identification of any clinically significant safety signals.

Following its acquisition of Cardiokine in July 2016, Palladio conducted a safety assessment for potential hepatotoxicity in the Cardiokine hyponatremia program.  No lixivaptan-related liver toxicity was identified.

*Id.* ¶ 67 (quoting Registration Statement at 190) (emphasis in complaint) ("Statement No. 7").

Success in preclinical studies or early clinical trials may not be indicative of results obtained in later trials.

* * *

The results generated to date in preclinical studies or clinical trials for our product candidates do not ensure that later preclinical studies or clinical trials will demonstrate similar results. Our product candidates may fail to show the desired safety and efficacy in clinical development despite demonstrating positive results in preclinical studies or having successfully advanced through initial clinical trials.

* * *

[O]ur belief in the therapeutic potential of lixivaptan is based, in part, on experiences of Cardiokine in its development of this molecule for a hyponatremia indication, which included over 30 clinical trials.

*Id.* ¶ 72 (quoting Registration Statement at 26, 31) (emphasis in complaint) ("Statement No. 8").[3]

Plaintiffs argue that these statements "were materially false and misleading and/or lacked a reasonable basis when made because prior studies and the DILIsym analysis did not support Defendants' claim that lixivaptan was a safer alternative to tolvaptan," because of the alleged issues with both the studies' durations and their patient populations described above. *See id.* ¶¶ 65–70.

Plaintiffs argue that Statement No. 7 was "especially misleading" given the non-ADPKD lixivaptan Legacy Studies' "significantly shortened duration of treatment indicated for hyponatremia and the lack of evidence that liver toxicity is an issue in non-ADPKD populations." *Id.* ¶ 67. In particular, Plaintiffs argue that the omission that "unlike for ADPKD, the FDA did not require a REMS program or blackbox warning for tolvaptan when used for hyponatremia" was "especially misleading because Defendants cited the non-ADPKD lixivaptan clinical trials as 'the most useful safety data' supporting its belief of lixivaptan's differentiated safety profile . . . ." *Id.* ¶ 68 (quoting the Registration Statement at 190).

---

[3] Although not listed in this section of the complaint, Plaintiffs also take issue with the following statement, which similarly relates to the safety profile of lixivaptan:

"We believe that lixivaptan may offer similar therapeutic activity in treating ADPKD as compared to tolvaptan while avoiding DILI associated with tolvaptan use in this patient population."

*Id.* ¶ 41 (quoting Registration Statement at 182) ("Statement No. 11").

11

Moreover, Plaintiffs argue that Statement No. 8—one of the Registration Statement's risk disclosures—was "materially misleading when made because a reasonable investor would believe that the preclinical studies and legacy non-ADPKD trials were adequately designed to provide useful data on the safety profile of lixivaptan—especially with respect to the 'over 30 clinical trials' conducted by Cardiokine for a hyponatremia indication." *Id.* ¶ 73. But "the mean duration of exposure in the legacy non-ADPKD trials was just 27.5 days—an inadequate amount of time for liver toxicity to develop and be observed—and involved non-ADPKD patients . . . ." *Id.*

Absent the additional information regarding issues with the studies' durations and populations, Plaintiffs argue, "a reasonable investor would be led to believe that Defendants' statements about lixivaptan's safety profile were adequately supported by the specific data cited by Defendants, thereby preventing investors from adequately assessing the risk that further clinical data would show lixivaptan was in fact no safer than the current drug on the market, tolvaptan." *Id.* ¶ 71.

### 2. Clinical and Commercial Prospects Statements

Plaintiffs contend that Defendants made, in the Registration Statement, the following "misleading" statements about lixivaptan's clinical and commercial prospects:

> [Defendants stated] that the ALERT study was "ongoing," with "[t]he first patient . . . dosed in November 2020" and . . . that "[u]p to 50 subjects will be enrolled and treated." The Registration Statement further stated that Centessa would begin its pivotal ACTION trial after "evaluat[ing] . . . the on-going [ALERT Study] results" to determine if the data "continue to support" [Centessa's] view of lixivaptan's safety profile, and anticipated dosing the first patient in the ACTION study in early 2022.

*Id.* ¶ 76 (first quoting Registration Statement at 188, and then quoting Registration Statement at 119) (emphasis in complaint) ("Statement No. 9"). Plaintiffs argue that "[a] reasonable investor . . . would understand the above statements to indicate that, absent an adverse event, unlike tolvaptan, lixivaptan would likely be readily accepted into an expanded market." *Id.* ¶ 77. But, as alleged, "Centessa was already facing issues with market acceptance, having only enrolled two patients

between the start of the enrollment in September 2020 and the date of the Registration Statement,

April 21, 2021." *Id.*

Plaintiffs argue that these statements were therefore "misleading" insofar as Defendants

"underplay[ed] the weak demand for the drug by emphasizing the size of the potential market, while

failing to disclose that data did not show that lixivaptan was a safer alternative to tolvaptan and that

Centessa was struggling to enroll patients in its ongoing Phase 3 ALERT safety study—an indication

of a lack of interest in the treatment from both ADPKD patients and practitioners." *Id.* ¶ 74.  In

other words, "Centessa was already facing market adoption issues as it struggled to enroll patients in

its ongoing Phase 3 ALERT safety trial—notwithstanding the Company's claims about lixivaptan's

safety profile." *Id.* ¶ 75.

In addition, Plaintiffs argue that the Registration Statement's disclosure of risk factors was

"false and misleading." *Id.* ¶ 78.  On this, Plaintiffs allege that Defendants stated:

> <u>We may encounter substantial delays or *challenges in the initiation*, conduct or completion *of our clinical trials*</u>, and the results of clinical development are uncertain.
>
> ***
>
> <u>Events that may prevent successful or timely completion of clinical development include . . . delays</u> in opening a sufficient number of clinical trial sites and <u>recruiting an adequate number of suitable patients to participate in our clinical trials</u> . . . .
>
> ***
>
> <u>The start or end of a clinical study is often delayed or halted due to</u> changing regulatory requirements, manufacturing challenges, required clinical trial administrative actions, <u>slower than anticipated patient enrollment.  . . . For instance, delays or difficulties in patient enrollment or difficulties in retaining trial participants can result in increased costs, longer development times or termination of a clinical trial.</u>

*Id.* (first quoting Registration Statement at 9, then quoting Registration Statement at 27, and then

quoting Registration Statement at 24) (emphasis—both italics and underscores—in complaint)

("Statement No. 10").  Plaintiffs argue that this collection of statements was misleading because

"Defendants failed to disclose that the risk of enrollment problems had already materialized at the

time the statements were made." *Id.* ¶¶ 78–79.  This is because, again, at the time of the IPO, only

two patients were enrolled in the ALERT Study.  *Id.* ¶ 79.

### D.  The Risk Disclosures

Beyond the challenged statements, the Registration Statement includes a number of risk

disclosures.  It stated that Centessa was "an emerging growth company."  Registration Statement at

9.  The Company stated that "[d]ata-driven decision making is at the core of [its] asset-centric

model," and that Centessa management "aims to expeditiously terminate programs when the data do

not support advancing a program;" this is "designed to reflect [the Company's] 'fail fast and fail

early' philosophy when data warrants."  *Id.* at 2.  The Registration Statement summarized a number

of "[r]isks [a]ffecting [Centessa's] [b]usiness," noting that the Company "is subject to a number of

risks of which you should be aware before making an investment decision."  *Id.* at 8.  These include

that the Company "may not be successful in [its] efforts to use [its] differentiated asset-centric

business model to build a pipeline of product candidates with commercial value."  *Id.*

Centessa added that its "product candidates are in various stages of development, including

many in preclinical stages, and may fail in development," that "[s]uccess in preclinical studies or early

clinical trials may not be indicative of results obtained in later trials," that it "may encounter

substantial delays or challenges in the initiation, conduct or completion of [its] clinical trials, and the

results of clinical development are uncertain," that "[e]ven if [it] complete[s] the necessary preclinical

studies and clinical trials, the marketing approval process is . . . uncertain," and that it had "never

commercialized a product candidate and [it] may lack the necessary expertise, personnel and

resources to successfully commercialize any of [its] products . . . ."  *Id.* at 9.  These risks were spelled

out in greater detail in the Registration Statement's "Risk Factors" section, which spans about 80

14

pages, and states that "[i]nvesting in [Centessa's] securities involves a high degree of risk" for a number of reasons. *See id.* at 16–95.[4]

The Registration Statement included a number of risk disclosures regarding the clinical trials. *Id.* at 26 ("Success in preclinical studies or early clinical trials may not be indicative of results obtained in later trials."); *id.* at 27 ("We may encounter substantial delays or challenges in the initiation, conduct or completion of our clinical trials, and the results of clinical development are uncertain."); *id.* ("A failure of one or more clinical trials can occur at any stage of testing.  Events that may prevent successful or timely completion of clinical development include . . . delays in opening a sufficient number of clinical trial sites and recruiting an adequate number of suitable patients to participate in our clinical trials . . . [and] occurrence of serious adverse events associated with the product candidate that are viewed to outweigh its potential benefits . . . .").

The Registration Statement also warned of the risk of enrollment challenges.  *See id.* at 29 ("We may find it difficult to enroll patients in our clinical trials, which could delay or prevent us from proceeding with clinical trials of our product candidates."); *id.* ("Some of our product candidates are designed to target orphan indications.  For example, Palladio is developing lixivaptan for the treatment of ADPKD . . . .  Trials in orphan indications often take longer to enroll than trials for other indications due to the smaller patient population from which subjects can be recruited."); *id.* at 30 ("We may not be able to identify, recruit and enroll a sufficient number of patients, or those with required or desired characteristics, to complete our clinical trials in a timely manner.  Patient enrollment and trial completion is affected by factors including:  size of the patient population and

---

[4] *See also id.* at 16 ("We may not be successful in our efforts to use our asset-centric business model to build a pipeline of product candidates with commercial value."); *id.* at 20 ("We . . . may never achieve or maintain profitability."); *id.* at 21 ("Our limited operating history may make it difficult for investors to evaluate our business, operations and prospects."); *id.* ("We have never generated revenue from product sales and may never be profitable."); *id.* at 22 ("To execute our business plan, we will need, among other things, to . . . satisfy the requirements of clinical trial protocols, including patient enrollment[ and] establish and demonstrate the clinical efficacy and safety of our product candidates . . . ."); *id.* at 24 ("Our product candidates are in various stages of development, including many in discovery and preclinical stages, and may fail in development or suffer delays that materially adversely affect their commercial viability.").

process for identifying subjects; . . . eligibility and exclusion criteria; . . . [and] perceived risks and benefits of the product candidate under study . . . ."); *id.* ("If we have difficulty enrolling a sufficient number of patients to conduct our clinical trials as planned, we may need to delay, limit or terminate ongoing or planned clinical trials, any of which would have an adverse effect on our business, financial condition, results of operations and prospects."); *id.* at 123–24 ("The successful development of . . . current or future product candidates is highly uncertain. . . . This uncertainty is due to the numerous risks and uncertainties . . . , including . . . the ability and the length of time required to enroll suitable patients . . . [and] any side effects associated with product candidates . . . .").

Some of these warnings were articulated specifically for lixivaptan. *See id.* at 31 (warning of potential future delays with lixivaptan—for example, "[i]f the FDA requires additional development and testing of lixivaptan, . . . we would be required to expend additional resources and our developmental timelines for this candidate will be delayed"); *id.* at 31–32 ("[C]ertain historical trials conducted with lixivaptan were conducted by a third party sponsor for an indication other than ADPKD. To the extent any data from historical trials are intended to support a marketing application for ADPKD, lesser weight may be applied to such data.").

And Centessa warned of the risks of their "product candidates" possibly causing "undesirable side effects," too, which "could delay or prevent their regulatory approval, limit the commercial potential or result in significant negative consequences following any potential marketing approval." *Id.* at 35; *see also id.* ("If on-target toxicity is observed, or if our product candidates have characteristics that are unexpected, we may need to abandon their development . . . ."); *id.* ("While we believe that our product candidates have demonstrated manageable tolerability profiles thus far in the target indications, there can be no assurance that it or any of our other product candidates will not cause more severe side effects in a greater proportion of patients. In addition, some of our product candidates are intended to address limitations in current treatment

16

approaches by offering potentially greater tolerability.  If we do not observe a favorable tolerability profile . . . differentiat[ing our product] from competitors . . . , we may decide to suspend or terminate development of such candidates.").  The Company added that "[t]he degree of market acceptance of our product candidates, if approved for commercial sale, will depend on several factors, including:  the efficacy and safety of such product candidates as demonstrated in clinical trials; [and] the prevalence and severity of any side effects . . . ."  *Id.* at 58.  Further, "[i]f the market opportunities for our product candidates are smaller than we believe they are, it may not be financially viable to commercialize . . . ."  *Id.* at 59.

In addition, the Registration Statement's risk disclosures stated that investors "could lose all or part of [their] investment," which could be in part due to "adverse results or delays in preclinical studies and clinical trials; our decision to initiate a clinical trial, not to initiate a clinical trial, or to terminate an existing clinical trial; . . . [or] unanticipated serious safety concerns related to the use of our product candidates," among other risks.  *Id.* at 78–79.

Last, the Registration Statement commented on the lixivaptan ALERT and ACTION studies as follows:

> Prior to initiating the ACTION Study and dosing the first patient, the Company will consider the status and on-going results of the Phase 3a safety study (designated the ALERT Study).  As this is an open-label study *for which enrollment is on-going*, the Company will evaluate if the on-going results support the belief that lixivaptan has a de-risked safety profile. Assuming the on-going results from the ALERT Study continue to support this view, the probability of commencing the ACTION study and dosing the first patient is high and is currently expected during early-to-mid 2022.

*Id.* at 119 (emphasis added); *accord id.* at 157; *see also id.* at 188 (stating that "[t]he first patient in [the ALERT Study] was dosed in November 2020," and that "[u]p to 50 subjects will be enrolled and treated").

### E.  The Post-IPO Press Release

"On June, 2, 2022, Defendants issued a press release announcing Centessa's decision to discontinue clinical development for lixivaptan for ADPKD following a 'recent observation of

[ALT] and [AST] elevations in one subject in the ALERT study,'" which had been designed to assess liver safety.  *Id.* ¶ 80 (quoting the press release, brackets in complaint); *id.* ¶ 8.  Defendants' press release allegedly stated:

> The ALERT Study was designed to help provide an early assessment of the safety profile of lixivaptan in ADPKD patients who previously experienced liver chemistry abnormalities while treated with tolvaptan, the only FDA approved therapy for ADPKD.  In assessing the recent data from a subject in the ALERT Study, we believe that lixivaptan is unlikely to achieve the differentiated safety and tolerability profile Centessa required for further development of the program.

*Id.* ¶ 80 (quoting Dkt No. 73-7 (the "Press Release") at 5 (ECF)).[5]

Jefferies allegedly described the discontinuation as "[u]nexpected[]" and "a big disappointment," and a Jefferies report released the same day "downgraded Centessa stock from 'buy' to 'hold' and from a $37 per ADS valuation to $4 per ADS."  *Id.* ¶ 81 (quoting the report).  Centessa's ADS price then "fell $1.25 per share, or 27.78%, to close at $3.25 per share on June 2, 2022."  *Id.* ¶ 82.

## II.    PROCEDURAL HISTORY

Plaintiffs initiated this action on September 28, 2022.  Dkt. No. 1.  On December 12, 2022, Ms. Fernandes and Mr. Nagler were appointed Lead Plaintiffs.  Dkt. No. 40.  Lead Plaintiffs filed their amended complaint on February 10, 2023.  Dkt. Nos. 43, 44 (the "FAC").[6]  Lead Plaintiffs alleged that they purchased or acquired the Centessa ADSs "at artificially inflated prices pursuant or traceable to the IPO and suffered damages as a result of Defendants' violations of the federal securities laws."  *Id.* ¶ 12.  They alleged that they "purchased or acquired Centessa ADSs without knowledge of the misstatements and omissions alleged" in the complaint.  *Id.* ¶ 99.  They brought suit "individually and on behalf of all persons and entities other than Defendants that purchased or

---

[5] Plaintiffs did not object to the Court's consideration of this exhibit.  *See* Opp'n.  This exhibit is referenced in the complaint and is properly considered for purposes of evaluating the motion to dismiss.  *See Lynch*, 952 F.3d at 79.
[6] The FAC was refiled at Dkt. No. 44, following a notation from the Clerk's Office that Dkt. No. 43 was deficiently filed.

otherwise acquired Centessa ADSs pursuant or traceable to the Registration Statement issued in connection with the Company's IPO conducted on or about May 28, 2021." *Id.* ¶ 83.[7]

In the FAC, Lead Plaintiffs asserted claims against Defendants under Sections 11 and 15 of the Securities Act of 1933. *Id.* ¶ 9; 15 U.S.C. §§ 77k and 77o (the "Securities Act"). The defendants include Centessa, the issuer of the securities; eleven individual defendants (the "Individual Defendants"[8]), all of whom allegedly signed or authorized the Registration Statement and were officers or directors of Centessa; and Morgan Stanley & Co. LLC ("Morgan Stanley") and Goldman Sachs & Co. LLC ("Goldman Sachs," and together with Morgan Stanley, the "Underwriter Defendants"), who together allegedly served as underwriters for the IPO, assisted in its planning, and "were required to conduct . . . a 'due diligence' investigation, in order to participate in the IPO."[9] *See* FAC ¶¶ 15–28, 95–97. Plaintiffs brought claims against all of the defendants for Section 11 violations, and against the Individual Defendants for the Section 15 violations. *See id.* ¶¶ 92–103. The complaint further states that "Plaintiffs expressly disclaim any allegations of fraud or fraudulent conduct or motive with respect to" the count alleging Section 11 violations. *Id.* ¶ 94.

---

[7] Lead Plaintiffs have not moved for class certification, nor has the Court certified the class.

[8] The Individual Defendants include Saurabh Saha, who served as CEO and Director of Centessa and signed the Registration Statement filed with the SEC, FAC ¶ 15; Gregory Weinhoff, Centessa's CFO, who also signed the Registration Statement, *id.* ¶ 16; Marella Thorell, who signed the Registration Statement and served as Centessa's Chief Accounting Officer "at all relevant times until July 21, 2022," *id.* ¶ 17; and Francesco De Rubertis, who served as Director of Centessa and Chairman of Centessa's Board of Directors, and allegedly authorized the signing of the Registration Statement, *id.* ¶ 18. The Individual Defendants also include a number of Directors of Centessa who allegedly authorized the signing of the Registration Statement: Arjun Goyal, Aaron Kantoff, Brett Zbar, Mary Lynne Hedley, Samarth Kulkarni, and Robert Califf. *Id.* ¶¶ 19–23, 25. Carol Stuckley, another Director at Centessa, allegedly signed the Registration Statement. *Id.* ¶ 24. Plaintiffs contend that "the Individual Defendants each possessed the power and authority to control the contents of Centessa's reports to the SEC, press releases, and other public statements and presentations." *Id.* ¶ 102.

[9] As alleged, under the IPO underwriting agreement, the Underwriter Defendants "were designated the lead underwriters in the IPO." *Id.* ¶ 26. And "[t]he IPO was a firm commitment underwriting, meaning the underwriters agreed to purchase all of the shares in the IPO and sell them to the investing public." *Id.* Plaintiffs allege that "the Underwriter Defendants had continual access to confidential corporate information concerning Centessa's drug pipeline and financial prospects," and that they "employed analysts with specific expertise in biopharmaceutical valuations." *Id.* ¶ 98. They allegedly "met with Centessa's lawyers, management, and top executives in connection with the IPO" and "made joint decisions regarding" its terms, "the strategy to best accomplish the IPO," and "the information to be included in the Registration Statement." *Id.*

19

Plaintiffs' FAC seeks a declaration "that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure," and certification of the Lead Plaintiffs "as Class Representatives and Co-Lead Counsel as Class Counsel." *Id.* ¶ 104. Plaintiffs also seek compensatory damages, pre- and post-judgment interest, and attorneys' fees, expert witness fees, and other expenses, as well as extraordinary, equitable, and injunctive relief. *Id.* Last, they seek "leave to amend the complaint to conform to the evidence," and "such other relief as this Court may deem just and proper." *Id.*

Defendants moved to dismiss the FAC on June 7, 2023. *See* Dkt. No. 71; Dkt. No. 72 (the "Mem."); Dkt. No. 73 (the "Linken Decl."). The motion is fully briefed. *See* Dkt. No. 77 (the "Opp'n"); Dkt. No. 82 (the "Reply").

### III.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable

inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  A complaint must therefore contain more than "naked assertion[s] devoid of further factual enhancement."  Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79).  Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

"A court's task" on a motion to dismiss "is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side."  *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).  "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits.  The Rule thus assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it."  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).

Finally, on a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint."  *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006).  But a court may consider "any 'written instrument' . . . attached to [the complaint] as 'an exhibit' or . . . incorporated in it by reference."  *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c) (other citations omitted)).  A court may also consider a document "solely relie[d]" on by the plaintiff if it "is integral to the complaint."  *Id.*  (quotation and brackets omitted).  A document is "integral to the complaint" if the complaint "relies heavily" on the document's "terms and effect."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016).  A plaintiff must "*rely* on the terms and effect of the document in drafting the complaint; mere notice or possession is not enough."  *Nicosia,*

834 F.3d at 231 (emphasis added) (quoting *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006)).  Here, as the Registration Statement is clearly integral to the complaint, the Court considers it in evaluating the motion to dismiss.  Although the Court can consider this filing with the SEC, the Court considers it "'only to determine what the document[] stated,' and 'not to prove the truth of [its] contents.'"  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).[10]

## IV.    DISCUSSION

"Sections 11, 12(a)(2), and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions.  Section 11 applies to registration statements, and section 12(a)(2) applies to prospectuses and oral communications." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. §§ 77k(a), 77l(a)(2)).  "Section 15, in turn, creates liability for individuals or entities that 'control[] any person liable' under section 11 or 12." *Id.* (citing 15 U.S.C. § 77o).  "Thus, the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under section[] 11 . . . ." *Id.*; *see also Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 595 (S.D.N.Y. 2022), *aff'd sub nom. Tseng v. De Vries*, No. 22-2787-CV, 2023 WL 8073087 (2d Cir. 2023) ("Claims under Section 15 hinge on the success of claims under Section[] 11

---

[10] The parties dispute whether the Court should consider, in evaluating the motion to dismiss, Exhibits 4 and 5.  Exhibit 4 is described as "excerpts from the Clinical Review(s) Application for JYNARQUE (Tolvaptan), before the U.S. Food & Drug Administration ('FDA'), Application No. 204441Orig1s000 (2018)."  Linken Decl. ¶ 6.  And "Exhibit 5 is an excerpt of the Medication Guide for JYNARQUE (Tolvaptan), U.S. FOOD & DRUG ADMIN., MEDICATION GUIDE 204441 . . . ." *Id.* ¶ 7.  The parties dispute both whether these documents are referenced in, and whether they are integral to, the complaint.  *See* Opp'n at 34–35 (contending that these documents "are neither referenced, nor relied upon, in the [amended complaint]," and asking the Court to "disregard them and . . . Defendants' arguments pertaining to them"); Reply at 19–20 (arguing that "the exhibits are referenced in the Amended Complaint" because "Plaintiffs expressly note the FDA's approval process for Tolvaptan, and the Tolvaptan 'blackbox' label," and Defendants argue that these documents are "integral" to the complaint because "Plaintiffs' theory is grounded in (i) the FDA approval process for Tolvaptan . . . , and (ii) the risk of liver injury described in the Tolvaptan 'blackbox' label" (citing FAC ¶¶ 40–41, 47–51)).  The Court need not resolve this issue.  For the reasons described below, Defendants' motion to dismiss is granted without the Court's consideration of these exhibits, as Plaintiffs' complaint—considered in conjunction with the entirety of the Registration Statement—fails to adequately plead a Section 11 violation.

. . . , as Section 15 provides for liability of any person who, by or through stock ownership, agency, or otherwise, 'controls any person' found liable under Section[] 11 . . . ." (citing 15 U.S.C. § 77o)).

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Morgan Stanley*, 592 F.3d at 358–59 (quoting 15 U.S.C. § 77k(a)). "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Id.* (quoting 15 U.S.C. § 77k(a)). "'Liability attaches to a security's issuer, its underwriter, and certain other statutorily enumerated parties pursuant to section 11 . . . if any part of the operative registration statements' contained such a misstatement or omission." *Garnett*, 632 F. Supp. 3d at 595 (quoting *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 101 (2d Cir. 2013)).

### A.  The Pleading Standard

"Fraud is not an element or a requisite to a [Securities Act] claim" and "a plaintiff need allege no more than negligence to proceed under Section 11 . . . ." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).[11]  Nevertheless, "the heightened pleading standard of Rule 9(b) applies to Section 11 . . . claims insofar as the claims are premised on allegations of fraud." *Id.* at 167.  "*Rombach* necessarily requires a case-by-case analysis of particular pleadings to determine whether 'the gravamen of the complaint is plainly fraud.'" *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (quoting *Rombach*, 355 F.3d at 172).

"In practice, courts rely on four factors to determine whether Section 11 claims sound in fraud:  whether '(1) the complaint contains merely a blanket disclaimer that the plaintiffs do not

---

[11] *See also In re Morgan Stanley*, 592 F.3d at 359 ("[P]laintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation.").

allege fraud for the purposes of the Securities Act claims; (2) the allegations themselves include classic fraud language; (3) the complaint does not show any basis for the claims that is non-fraudulent; and (4) the plaintiffs do not separate the factual allegations supporting the fraud claims and negligence claims, but rather require the courts to parse the complaints.'" *In re NIO, Inc. Sec. Litig.*, No. 19CV1424NGGJRC, 2021 WL 3566300, at *5 (E.D.N.Y. Aug. 12, 2021) (quoting *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 392 (E.D.N.Y. 2013)).

The parties dispute whether the pleading standard of Rule 8(a) or that of Rule 9(b) applies.[12] *See* Mem. at 19–21; Opp'n at 5–7.  The complaint contains blanket disclaimers of fraud with respect to the Securities Act claims.  *See, e.g.*, FAC ¶ 94 (contending that Plaintiffs' Section 11 "count alleges strict liability and negligence and does not sound in fraud.  Plaintiffs expressly disclaim any allegations of fraud or fraudulent conduct or motive with respect to this Count."); *id.* ¶ 1 ("Plaintiffs' Complaint asserts claims against the Defendants under Sections 11 and 15 of the Securities Act of 1933 . . . arising from Defendants['] negligence and does not allege fraud.").[13]  And the Securities Act claims allege that the Individual Defendants acted "negligently;" Lead Plaintiffs base these allegations on the Individual Defendants' "negligent[] prepar[ation]" of the Registration Statement, as alleged in the complaint.  *See id.* ¶¶ 15–25.

Defendants argue that many of the remaining "allegations themselves include classic fraud language." *See NIO*, 2021 WL 3566300, at *5; Mem. at 20–21 (citing FAC ¶¶ 5–7, 46, 52, 59, 65, 68–69, 73–75, 78–79; *Rombach*, 355 F.3d at 172).[14]  Plaintiffs disagree, arguing that the complaint "alleges

---

[12] Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," whereas Rule 9(b) requires that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. Rs. Civ. P. 8(a), 9(b).

[13] Of course, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *See Iqbal*, 556 U.S. at 678.

[14] For example, beyond contending that the challenged statements "were materially false and misleading," *see* FAC ¶ 65, Plaintiffs alleged that Defendants "underplay[ed] the weak demand for the drug," *id.* ¶ 74; that "Defendants repeatedly pointed to unreliable data from legacy non-ADPKD studies and DILIsym to support their belief that lixivaptan would have a differentiated safety profile," although "at the time of the IPO, Defendants' contention that lixivaptan was a safer alternative lacked any reasonable basis," *id.* ¶ 75; that the Legacy Studies "were an inaccurate and inadequate predictor of safety and tolerability in lixivaptan," *id.* ¶ 73; that Centessa "failed to disclose that, at the time of the IPO, the Company was already seeing signs of weak demand from both patients and doctors as it struggled to enroll participants," *id.* ¶ 7; *id.*

only negligence and specifically disclaims fraud," and that "[t]he allegations in the [complaint] track the language of Section 11 insofar as the [complaint] identifies two categories of 'false and/or misleading statements' and describes why the statements were 'materially false and misleading and/or lacked a reasonable basis when made.'" Opp'n at 6 (citing FAC ¶¶ 63, 65-70, 73-75, 78-79; *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017) (finding that where a plaintiff's "allegations simply track[ed] the language of Section 11, . . . they [did] not sound in fraud. To hold that bare recitations of the elements of the causes of action triggered Rule 9(b) would be contrary to the holding of the Court of Appeals in *Rombach* . . . .")).

The Court need not resolve the question here. Even assuming, *arguendo*, that the Rule 8(a) pleading standard applies, for the reasons that follow, the Court finds that the Lead Plaintiffs have failed to state a claim for violations of Section 11 or 15.

### B. Material Misstatements or Omissions

"When analyzing offering materials for compliance with the securities laws, we review the documents holistically and in their entirety." *In re Morgan Stanley*, 592 F.3d at 365–66. "In many cases . . . two issues are central to claims under section[] 11 . . . ." *Id.* at 360. These are:

> (1) the existence of either a misstatement or an unlawful omission; and (2) materiality. The definition of materiality is the same for these provisions as it is under section 10(b) of the Exchange Act: "[W]hether the defendants' representations, taken together and in context, would have misled a reasonable investor." However, because the materiality element presents "a mixed question of law and fact," it will rarely be dispositive in a motion to dismiss: "[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

*Id.* (internal citations omitted).

---

¶ 75 (similar); that "[i]n truth, Centessa was already facing issues with market acceptance, having only enrolled two patients" by the date of the Registration Statement, *id.* ¶ 77; that "the Company warned that 'challenges' in enrollment could interfere with clinical development and may even lead to a discontinuation of trials, when that risk had already materialized," *id.* ¶ 78; and that "Defendants failed to disclose that the risk of enrollment problems had already materialized at the time the statements were made," *id.* ¶ 79.

"[F]ederal securities law 'do[es] not create an affirmative duty to disclose any and all material information,'" *Garnett*, 632 F. Supp. 3d at 597 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)), and "there is no liability in the absence of a duty to disclose, even if the information would have been material," *In re Morgan Stanley*, 643 F. Supp. 2d at 375; *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003) ("To state a claim under Sections 11 and 12(a)(2), a plaintiff must allege that the defendants had a legal obligation to disclose the allegedly omitted information."). Rather, "[a]n omission is actionable only when disclosure of information is 'necessary' to make the statements in the registration statement and/or prospectus 'not misleading.'" *Garnett*, 632 F. Supp. 3d at 597 (quoting 15 U.S.C. §§ 77k(a), 77l(a)(2)). "In other words, 'when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate.'" *Id.* (quoting *In re Morgan Stanley*, 592 F.3d at 366 (some internal quotation marks and citations omitted)). And "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of 'defendants' representations, taken together and in context.'" *In re Morgan Stanley*, 592 F.3d at 366 (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)).

To incur liability, misstatements or omissions must be material. "In judging whether an alleged omission was material in light of the information already disclosed to investors, [courts] consider whether there is 'a *substantial* likelihood that the disclosure of the [omitted material] would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information [already] made available.'" *In re ProShares*, 728 F.3d at 102 (quoting *DeMaria*, 318 F.3d at 180) (emphasis in *ProShares*); *see also In re Morgan Stanley*, 592 F.3d at 360 (definition of materiality is the same under Sections 11 and 12(a)(2) as it is under Section 10(b) of the Exchange Act). "Moreover, 'it is well established that an alleged misstatement does not qualify as material if the relevant facts are already in the mix of public information at the time of an IPO.'" *Garnett*, 632 F. Supp. 3d at 597 (quoting *In re Qudian Sec. Litig.*, 2019 WL 4735376, at *6). "Therefore, the Second Circuit has held,

26

'the materiality hurdle remains a meaningful pleading obstacle, and we will dismiss a section 11 claim where the alleged omission was 'so obviously unimportant to a reasonable investor' that reasonable minds would agree on that omission's unimportance.'" *Id.* (quoting *In re ProShares*, 728 F.3d at 102).

"Where the principal issue is materiality, an inherently fact-specific finding, the burden on plaintiffs to state a claim [under Section 11] is even lower" than the burden to allege the existence of an omission or misstatement. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011). And "because the materiality element presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss." *In re Morgan Stanley*, 592 F.3d at 360 (quoting *ECA v. JP Morgan Chase*, 553 F.3d 187, 197 (2d Cir. 2009)).

### 1.  Statements of Opinion

The Second Circuit has held that "what distinguishes a fact from an opinion under the federal securities laws" is that "[i]n general, a fact is 'a thing done or existing or an actual happening,' while an opinion is 'a belief, a view, or a sentiment which the mind forms of persons or things.'" *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 169 (2d Cir. 2023) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015)).  "A statement of fact 'expresses certainty about a thing,' while a statement of opinion does not."  *Id.*  And opinion statements "often include qualifying language (like 'I believe' or 'I think') that conveys a lack of certainty about the thing being expressed, marks the statement as reflecting the speaker's impression or point of view rather than an objective truth, and makes it easier to identify the statement as one of opinion rather than fact."  *Id.* (citing *Omnicare*, 575 U.S. at 183–84).

These are not magic words:  statements may be "one of opinion not just by virtue of the words used but also because of the nature of the information conveyed."  *Id.* at 170; *see also Omnicare*, 575 U.S. at 183 (defining opinions as statements that—in contrast to statements of fact—do not "express[] certainty about a thing," or "imply . . . definiteness . . . or certainty" (citations and internal quotation marks omitted)).  "If a statement turns on the exercise of subjective judgment, a plaintiff

will be unable to establish that it is false merely by showing that other reasonable alternative views exist.  Where those alternatives exist, the speaker making the statement (expressing an opinion) can choose among them without running afoul of the federal securities provisions at issue here.  This is true even if most of the existing facts cut against the statement."  *New England Carpenters*, 80 F.4th at 170 (citing *Omnicare*, 575 U.S. at 189–90).

Statements of opinion can give rise to liability in two distinct ways, even if they are sincerely believed:  if they contain false embedded statements of fact, or if they "omit[] material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself . . . ."  *Omnicare*, 575 U.S. at 189; *see also New England Carpenters*, 80 F. 4th at 170–71.

First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'"  *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 575 U.S. at 185–86).  In other words:

> [P]laintiffs can allege that a statement of opinion contained one or more embedded factual statements that can be proven false.  A statement structured, "I believe that x is so because y has occurred," contains the factual and falsifiable statement, "y has occurred."  If y has in fact not occurred, the statement of opinion is actionable because an embedded but complete "statement of a material fact" under the first part of Rule 10b-5 can be proven false.

*Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020); *see also id.* (observing that Section 11 "shares the relevant text concerning false and misleading statements with Rule 10b-5").

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Tongue*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 188–89).  "[W]hether an omission makes an expression of opinion misleading always depends on context."  *Omnicare*, 575 U.S. at 190.  "[T]he investor takes into account the customs and practices of the relevant industry."  *Id.*  "[A]n omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame."

*Id.* "The reasonable investor understands a statement of opinion in its full context, and § 11 creates liability only for the omission of material facts that cannot be squared with such a fair reading." *Id.* at 190–91.

To establish liability for an omission, "plaintiffs can allege that a statement of opinion, without providing critical context, implied facts that can be proven false." *Abramson*, 965 F.3d at 175. These statements are actionable because a reasonable investor "expects not just that the [speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker]'s possession at the time." *Omnicare*, 575 U.S. at 188–89. However, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts," and "do[] not expect that *every* fact known to [a speaker] supports its opinion statement." *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 194) (internal quotation marks omitted). Therefore, a statement of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* (quoting *Omnicare*, 575 U.S. at 194) (internal quotation marks omitted). And "[w]hen a registration statement warns of the exact risk that later materialized, a Section 11 claim will not lie as a matter of law." *In re ProShares*, 728 F.3d at 102 (internal quotation marks and citation omitted).

At the pleading stage, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 209 (quoting *Omnicare*, 575 U.S. at 194) (internal quotation marks omitted). The "core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* at 210 (quoting *Omnicare*, 575 U.S. at 194). The Supreme Court emphasized that this "is no small task for an investor." *Omnicare*, 575 U.S. at 194.

### 2.    The "Bespeaks Caution" Doctrine

"Two doctrines—one statutory, the other judge-made—protect certain forward-looking statements from serving as the basis for claims of securities fraud." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 396 (S.D.N.Y. 2020). "First, the [Private Securities Litigation Reform Act ('PSLRA') of 1995] creates a statutory 'safe harbor' for certain statements." *Id.* "Second, courts have long protected forward-looking statements, even those made in connection with an IPO, under the bespeaks-caution doctrine." *Id.* "Because 'the safe harbor does not apply to statements made in connection with an initial public offering, such as an IPO prospectus,' only the 'bespeaks caution' doctrine" may apply in such cases. *Garnett*, 632 F. Supp. 3d at 597 (quoting *City of Omaha*, 450 F. Supp. 3d at 396 and citing 15 U.S.C. § 77z-2(b)(2)(D)).

"The bespeaks-caution doctrine is a corollary of the well-established principle that a statement or omission must be considered in context." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d. Cir. 2010) (citation and internal quotation marks omitted). "Under the bespeaks caution doctrine, 'alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.'" *Rombach*, 355 F.3d at 173 (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (brackets in *Rombach*)). "A forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys.*, 620 F.3d at 141. "In such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency." *Id.* "To apply [the doctrine], however, the cautionary language must pertain to the specific risk that was realized." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)). "'[C]autionary language [that] did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss' is insufficient." *Id.* (quoting *Halperin*, 295 F.3d at 357). And "[c]autionary words

30

about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173 (citing *In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.")).

Thus, "[w]hen there is cautionary language in the disclosure, the Court analyzes 'the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.'" *Rombach*, 355 F.3d at 173–74 (quoting *Halperin*, 295 F.3d at 357).

Nor do "expressions of puffery and corporate optimism . . . give rise to securities violations." *Id.* at 174. This is because "[u]p to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'" *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129–30 (2d Cir. 1994)).

### 3. Application

In reviewing the Registration Statement "in [its] entirety," the Court finds that Plaintiffs have failed to adequately plead "the existence of either a misstatement or an unlawful omission" that was material and likely to "have misled a reasonable investor." *See In re Morgan Stanley*, 592 F.3d at 365–66 (citation and internal quotation marks omitted). Nearly all of the challenged statements—which use qualifying language to state Centessa's "beliefs" and expressly disclaim certainty—are statements of opinion. *See New England Carpenters*, 80 F.4th at 169; *Omnicare*, 575 U.S. at 183–84; Statement No. 1 (indicating uncertainty and describing what Centessa "believe[d]"); Statement. No. 2 (similar);

31

Statement No. 3 (similar); Statement No. 4 ("the results of which we believe support lixivaptan[]");[15]

Statement No. 6 (indicating uncertainty and describing what Centessa "believe[d]"); Statement No. 7

(indicating uncertainty and describing what "Palladio consider[ed]");[16] Statement No. 8 ("Success in

preclinical studies or early clinical trials may not be indicative of results obtained in later trials."

(expressing uncertainty));[17] Statement No. 10 ("We may encounter substantial delays or challenges

. . . ." (expressing uncertainty));[18] Statement No. 11 (indicating uncertainty and describing what

Centessa "believe[d]").

Plaintiffs have failed to allege any actionable misstatements.  Plaintiffs first argue that the

statements about the Legacy Studies—which their opposition identifies as Statements No. 4 and 7—

contain false embedded statements of fact "and were missing critical context, without which the

statements implied false information:  that the hyponatremia trials supported that Lixi had a

comparatively de-risked safety profile."  Opp'n at 13.  But Plaintiffs have not alleged that

Defendants "did not hold the belief" that Centessa professed in these statements, nor that "the

supporting fact[s] [Defendants] supplied were untrue."  *Tongue*, 816 F.3d at 210 (quoting *Omnicare*,

575 U.S. at 185–86) (internal quotation marks omitted).  Statement No. 4 observes that lixivaptan

"was well tolerated" and that "[n]o liver toxicity signals were noted."  Nowhere do Plaintiffs allege

that these propositions were factually untrue.  The same is true of the challenged statements

concerning the Phase 2 Studies and the modeling.  *See* Statement No. 5 (stating that "[l]ixivaptan was

well tolerated" and that "[n]o liver toxicity signals were noted" in a Phase 2 study); Statement No. 6

---

[15] Statement No. 4 includes statements of facts as well, in its first sentence, the first clause of its second sentence, and the third sentence, as well as the fourth and fifth sentences—all of which describe, with certainty and as a matter of fact, Centessa's development program of lixivaptan for ADPKD.  Similarly, Statement No. 5, which describes the Phase 2 Studies as a factual matter, consists of statements of fact.

[16] Statement No. 7 also includes statements of fact, in its second sentence (observing that lixivaptan was "generally well tolerated"), third sentence ("Palladio conducted a safety assessment . . . ."), and fourth sentence ("No lixivaptan-related liver toxicity was identified.").

[17] Statement. No. 9 includes statements of fact, in observing that the ALERT study was "ongoing," that "[u]p to 50 subjects" would be enrolled in it, and that the ACTION trial would begin after Centessa evaluated the results of the ALERT Study.

[18] Statement No. 10 includes some statements of fact, too—for example, in observing that "[t]he start or end of a clinical study is often delayed or halted" for a number of reasons.

(stating Centessa's "belie[f]" that "results from" the Phase 2 study "suggest that lixivaptan may be a potent vasopressin V2 receptor antagonist . . . with a good tolerability profile and AEs that are consistent with previous studies").

Nor have Plaintiffs adequately alleged any actionable omissions. As far as the Legacy Studies, Phase 2 Studies, and Simulations are concerned, much of the "critical context" that Plaintiffs alleged was missing from the Registration Statement was, in fact, in it; and Plaintiffs' remaining critiques merely disagree with the underlying studies' designs. Any "omission" of these in-hindsight study design critiques was not likely to mislead a reasonable investor, nor were Defendants required to disclose every "fact cutting the other way." *See Tongue*, 816 F.3d at 210; *see also Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir. 2013) (concluding that "none of what was omitted was necessary to make the [defendant's statement] not misleading").

First, the Registration Statement contained many of the allegedly "omitted" facts at issue, namely, the studies' durations and patient populations.[19] It stated that one of the Phase 2 Studies had a seven-day duration and enrolled 31 subjects, *see* Registration Statement at 171, 184–85, while another of the Phase 2 Studies enrolled a single subject, *id.* at 187; and it disclosed that the Legacy Studies had 1,673 participants and a "mean duration of exposure [of] 27.5 days," *id.* at 190. Regarding the non-ADPKD patient populations, the Registration Statement stated that Centessa "believe[d] the potential of lixivaptan in ADPKD is supported by data to date, which includes extensive data from a quantitative-systems toxicology modeling tool, clinical development *in a different indication* as well as preclinical and clinical studies in ADPKD." *Id.* at 134 (emphasis added); *accord id.* at 181; *see also id.* at 31–32 (stating that "certain historical trials conducted with lixivaptan were conducted by a third party sponsor *for an indication other than ADPKD*. To the extent any data

---

[19] *See In re ProShares*, 728 F. 3d at 109 ("[A plaintiff] must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.").

from historical trials are intended to support a marketing application for ADPKD, *lesser weight may be applied to such data*." (emphases added)); *id.* at 184 (stating that one of the Phase 2 Studies involved "ADPKD subjects with different degrees of renal function impairment," who were "diagnosed with ADPKD"); *id.* at 190 ("Palladio considers *the legacy studies in healthy volunteers*, including PK studies, drug interaction studies, a renal insufficiency study and a thorough QTc study, to provide the most useful safety data for the current development program in ADPKD." (emphasis added)).

The Registration Statement also stated that "DILIsym representations predicted that lixivaptan is not likely to cause DILI and may be better tolerated than tolvaptan with respect to the mechanisms of liver toxicity currently represented in DILIsym.  The results of this work were published in a peer-reviewed journal."  Registration Statement at 183.  The results of the peer-reviewed journal were not replicated within the Registration Statement.[20]  *See generally id.*  Defendants contend that the journal article that was referenced (although not named) in the Registration Statement clarifies "that DILIsym modeling was based on non-ADPKD patient simulated populations and did not account for adaptive immune response."  Mem. at 29 (citing Dkt. No. 73-8 at 2, 11).  Regardless of what the referenced article says, the Registration Statement's opinion statements predicting lixivaptan's safety profile on the basis of the Simulations did not need to include every single "fact cutting the other way."  *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 194) (internal quotation marks omitted).  Again, "[r]easonable investors understand that opinions

---

[20] Defendants argue that the Registration Statement "did not have to republish this publicly available information." Mem. at 29 n.139 (citing *Garber v. Legg Mason*, 347 F. App'x 665, 668 (2d Cir. 2009); *Shapiro*, 2023 WL 405020, *3-4; *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 452 (S.D.N.Y. 2014), *aff'd*, 588 F. App'x 37 (2d Cir. 2014); *In re Merrill Lynch*, 272 F. Supp. 2d at 249–50)); *see also Garnett*, 632 F. Supp. 3d at 597 ("[I]t is well established that an alleged misstatement does not qualify as material if the relevant facts are already in the mix of public information at the time of an IPO." (internal quotation marks and citation omitted)).  Plaintiffs argue that the content of this journal should not be considered, because "[i]nvestors are not obliged to engage in a scavenger hunt for unnamed articles and studies – especially ones that were not published contemporaneously with the Registration Statement – in order to determine the critical information that Defendants omitted," and these sources were not "'readily accessible' to investors."  *See* Opp'n at 21–22 & n.10.

34

sometimes rest on a weighing of competing facts," and "do[] not expect that *every* fact known to [a speaker] supports its opinion statement." *Id.*

Plaintiffs' remaining allegations are similar to those alleged—and found wanting—in *Kleinman*: critiques of the design of the Legacy Studies, Phase 2 Studies, and Simulations are "only [Plaintiffs'] view and [are] not alleged to be a mischaracterization" of the studies themselves, or Defendants' subjective beliefs about what the studies predicted or suggested. *See Kleinman*, 706 F.3d at 154. "Defendants are not required to adopt [Plaintiffs'] view regarding" the study's design "or its effect on the results." *See id.* Plaintiffs "may take issue with Defendants' researchers and scientists, but where a defendant's competing analysis or interpretation of data is itself reasonable, there is no false statement." *Id.*; *see also Tongue*, 816 F.3d at 210 ("Reasonable investors understand that opinions sometimes rest on a weighing of competing facts," and "do[] not expect that *every* fact known to [a speaker] supports its opinion statement."); *New England Carpenters*, 80 F.4th at 170 ("If a statement turns on the exercise of subjective judgment, a plaintiff will be unable to establish that it is false merely by showing that other reasonable alternative views exist. Where those alternatives exist, the speaker making the statement (expressing an opinion) can choose among them without running afoul of the federal securities provisions . . . . This is true even if most of the existing facts cut against the statement.")).

Thus, here as in *Kleinman*, the Court has "no basis to believe" that Defendants' statements regarding its studies' results and predictions "were unreasonable;" nor were any alleged omissions regarding additional study limitations likely to mislead a reasonable investor. This is especially true here, where the Registration Statement itself expressly *included* many of the facts that Plaintiffs argue were missing "critical context." At bottom, none of these alleged omissions concerning potential study design issues "make[] the [challenged] statement[s] misleading to a reasonable investor." *Tongue*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 188–89).

Moreover, the Company's statements regarding its beliefs and aspirations for lixivaptan were replete with "note[s] of caution." *See Kleinman*, 706 F.3d at 156. These notes were extensive—constituting approximately 80 pages of the Registration Statement—and Centessa's Registration Statement "warn[ed] of the exact risk that later materialized . . . ." *In re ProShares*, 728 F. 3d at 102 (internal quotation marks and citation omitted). That is to say, Centessa warned that an adverse toxicity event may occur in the clinical trials, causing the Company to delay or terminate clinical development. *See, e.g.*, Registration Statement at 35 ("Our product candidates . . . may cause undesirable side effects or have other properties that could delay or prevent their regulatory approval [or] limit the[ir] commercial potential . . . . Adverse events that occur in our trials may cause us . . . to halt, delay or amend . . . clinical development of our product candidates."); *id.* ("[C]ertain of our product candidates could cause undesirable side effects in clinical trials related to on-target toxicity. If on-target toxicity is observed, or if our product candidates have characteristics that are unexpected, we may need to abandon their development."); *id.* ("[S]ome of our product candidates are intended to address limitations in current treatment approaches by offering potentially greater tolerability. If we do not observe a favorable tolerability profile in testing of such product candidates that differentiate them from competitors in the market, we may decide to suspend or terminate development of such candidates."); *see also* Mem. at 28–29, 33 (collecting more examples). That is exactly what happened. *See* FAC ¶¶ 8, 80.

Plaintiffs argue that "[t]his misses the point" because "Plaintiffs do not allege that Defendants concealed the risk that Lixi could fail," but rather that Defendants unlawfully "told investors they had clinical and simulation evidence *bolstering* Lixi's *chances of success*." Opp'n at 23 (emphases in original); *see also id.* (citing *In re AIG Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("[G]eneric risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks."). Again, the Registration Statement did disclose information regarding the studies' durations and patient populations; and "[r]easonable investors

understand that opinions sometimes rest on a weighing of competing facts," and "do[] not expect that *every* fact known to [a speaker] supports its opinion statement." *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 194) (internal quotation marks omitted). That an issuer may "know[], but fail[] to disclose, some fact cutting the other way" does not render a statement misleading. *Id.* (quoting *Omnicare*, 575 U.S. at 194) (internal quotation marks omitted). Here, "in light of the information already disclosed," the Court finds that there is not a "*substantial* likelihood that the disclosure of the [allegedly omitted information] would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information [already] made available"" through the extensive and specific risk disclosures. *See In re ProShares*, 728 F.3d at 102 (quoting *DeMaria*, 318 F.3d at 180 (emphasis in *ProShares*)); *cf. Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb*, 28 F.4th 343, 354–55 (2d Cir. 2022) (observing that where "the relevant risk—that the trial may fail to reach its primary endpoint—was fully disclosed," the plaintiffs cited "no law to support" an argument that there was any "obligation to disclose *why* the trial might fail").

Under the bespeaks-caution doctrine, too, many of the alleged misstatements or omissions here are immaterial because "it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Rombach*, 355 F.3d at 173 (internal quotation marks and citation omitted). A threshold issue in determining the applicability of the bespeaks-caution doctrine is a determination of whether the challenged statements are forward-looking in nature. "As a general rule, statements whose truth cannot be ascertained until some time after they are made are 'forward-looking statements.'" *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 493 (S.D.N.Y. 2011) (internal quotation marks and citation omitted) (collecting cases). In discussing the bespeaks-caution doctrine in particular, the Second Circuit has contrasted "forward-looking" statements with statements of "present or historical facts," in other words, statements regarding "facts [that] exist and are known." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96–97 (2d Cir. 2004). "A forward-looking statement

37

(accompanied by cautionary language) expresses the issuer's inherently contingent prediction of risk or future cash flow; a non-forward-looking statement provides an ascertainable or verifiable basis for the investor to make his own prediction." *Iowa Pub. Emp. Ret. Sys.*, 620 F.3d at 143.

Here, many of the challenged statements are forward-looking. *See* Statement No. 1 ("We believe lixivaptan has the *potential* to deliver similar efficacy benefits to tolvaptan, . . . with a differentiated safety and tolerability profile that *may* enable access and therapeutic benefit to a broader set of patients." (emphases added)); Statement No. 2 ("We believe the *potential* of lixivaptan in ADPKD is supported by data to date . . . .") (emphasis added); Statement No. 3 ("We believe that lixivaptan *may* offer similar therapeutic activity in treating ADPKD as compared to tolvaptan . . . .") (emphasis added); Statement No. 4 ("DILIsym representations predicted that lixivaptan is not likely to cause DILI and *may* be better tolerated than tolvaptan . . . .") (emphasis added); Statement No. 6 ("[W]e believe results from PA-102 [Phase 2 ELiSA Study] *suggest* that lixivaptan *may* be a potent vasopressin V2 receptor antagonist . . . .") (emphases added); Statement No. 8 ("Success in preclinical studies or early clinical trials may not be indicative of results obtained in later trials. The results generated to date in preclinical studies or clinical trials for our product candidates do not ensure that later preclinical studies or clinical trials will demonstrate similar results. Our product candidates may fail . . . ."); Statement No. 9 (stating that Centessa would enroll and treat "[u]p to 50 subjects" in its ALERT Study, and that Centessa would begin its pivotal ACTION trial after "evaluat[ing] . . . the on-going [ALERT Study] results" to determine if the data "continue to support" Centessa's view of lixivaptan's safety profile); Statement No. 10 ("We *may encounter* substantial delays or challenges in the initiation, conduct or completion of our clinical trials, and the results of clinical development are uncertain.") (emphasis added); Statement No. 11 ("We believe

that lixivaptan *may* offer similar therapeutic activity in treating ADPKD as compared to tolvaptan . . . .").[21]

Moreover, the Registration Statement "expressly warn[ed] of" and included disclosures that "directly relate[d] to the risk that brought about plaintiffs' [alleged] loss"—namely, that Centessa would terminate its lixivaptan development program following observation of the same negative side effects that beset tolvaptan. *See Gregory*, 297 F. Supp. 3d at 398. In analyzing the Registration Statement "in [its] entirety," the Court concludes that "a reasonable investor would not have been misled" as to the risks associated with the lixivaptan clinical studies, development, or commercialization, given the extensive and on-point risk disclosures. *Rombach*, 355 F.3d at 173–74. And investors were specifically forewarned that, as a result of the exact problem the Registration Statement warned of—namely, the drug having adverse effects in clinical studies—they "could lose all or part of [their] investment," which could happen in part due to "adverse results or delays in preclinical studies and clinical trials; [Centessa's] decision to initiate a clinical trial, not to initiate a clinical trial, or to terminate an existing clinical trial; . . . [or] unanticipated serious safety concerns

---

[21] Plaintiffs argue that the challenged statements about "the bases for Defendants' purported 'beliefs' about [lixivaptan's] safety profile . . . are present-tense and backward-looking statements." Opp'n at 28–29. They argue that "[i]f a belief or hypothesis is already formed, its bases are – by tautology – already determined." *Id.* at 29. Defendants respond by observing that "[e]very projection is based on present-tense beliefs, including that present or past circumstances support the prediction." Reply at 7. The statements asserting Centessa's beliefs at the time were, of course, based on its current and previously collected data; but the beliefs themselves concerned forward-looking projections and predictions about the relative safety profile and commercial and clinical prospects of lixivaptan. These projections and predictions—with which Plaintiffs' complaint takes issue—are inherently forward-looking. *See Iowa Pub. Emp. Ret. Sys.*, 620 F.3d at 143 ("A forward-looking statement (accompanied by cautionary language) expresses the issuer's inherently contingent prediction of risk or future cash flow; a non-forward-looking statement provides an ascertainable or verifiable basis for the investor to make his own prediction."); *Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) ("[The challenged statements] refer to the present only as a means for gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of which they are a part.' . . . In other words, context is everything. . . . Defendants were not making guarantees about the present; they were stating their educated guess about what the preceding . . . data would mean for the Company's future."); *cf. Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 387 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) ("[S]tatements which merely endorse or state the speaker's belief in a certain future outlook satisfy the PSLRA forward-looking requirement."); *id.* (finding that statements "reflecting a belief in, and adoption of" projections "reflect management's judgment about the future performance" of the company).

related to the use of our product candidates," among other risks. *See* Registration Statement at 78–79.

Last, Plaintiffs contend that the bespeaks-caution doctrine cannot apply to Defendants' disclosures regarding alleged study enrollment issues because these issues "were already ongoing;" in other words, that particular "risk had *already* materialized," as alleged. *See* Opp'n at 29 & n.16. This is because, Plaintiffs argue, "Centessa had only enrolled two patients in the ALERT trial over a nine-month period, indicating broader market acceptance issues." *Id.* at 29–30; FAC ¶ 77 ("In truth, Centessa was already facing issues with market acceptance, having only enrolled two patients between the start of the enrollment in September 2020 and the date of the Registration Statement, April 21, 2021."). It is true that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173; *see also Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021) ("[C]autionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again."). In other words, "there is a 'critical distinction between disclosing the risk a future event *might* occur and disclosing actual knowledge that the event *will* occur'—particularly where that distinction holds 'enormous significance' for investors." *Set Cap.*, 996 F.3d at 85 (quoting *Dolphin & Bradbury, Inc. v. S.E.C.*, 512 F.3d 634, 640 (D.C. Cir. 2008)) (emphasis in original).

But Plaintiffs' interpretation does not read the enrollment statements in context. As discussed above, the Registration Statement specifically warned of the risk of study enrollment challenges; and it added that "[s]ome of our product candidates are designed to target orphan indications. For example, Palladio is developing lixivaptan for the treatment of ADPKD . . . . Trials in orphan indications often take longer to enroll than trials for other indications due to the smaller patient population from which subjects can be recruited." *See* Registration Statement at 29; *see also id.* at 30, 123–24. And Centessa did not state that it "was targeting enrollment of 50 participants," as

40

Plaintiffs' briefing misleadingly suggests.  *See* Opp'n at 24.  Rather, the Registration Statement described the ALERT Study as an "[o]ngoing [t]rial" that was "designed to assess [the] . . . safety and efficacy of lixivaptan in patients who previously experienced abnormal liver chemistry test results while treated with tolvaptan, and who were permanently discontinued from the drug for that reason. The first patient in this trial was dosed in November 2020.  Up to 50 subjects will be enrolled and treated."  Registration Statement at 188.[22]  Therefore, any alleged omission regarding the ALERT Study's then-current enrollment numbers would not have been likely to mislead a reasonable investor.

Accordingly, the Court finds that Plaintiffs have failed to state a claim for Section 11 liability because they failed to adequately plead "the existence of either a misstatement or an unlawful omission" that was likely to "have misled a reasonable investor."  *See In re Morgan Stanley*, 592 F.3d at 365–66 (citation and internal quotation marks omitted).

### C.  Negative Causation

Because Plaintiffs have failed to adequately allege any material misstatements or omissions as required to sustain Section 11 liability, the Court need not consider whether Defendants have adequately established the affirmative defense of negative causation.

### D.  Section 15

Because the Court finds that Plaintiffs have failed to adequately state a claim under Section 11, the Section 15 claim is dismissed.  *See id.* at 358 ("[T]he success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under section[] 11 . . . ."); *see also Garnett*, 632 F. Supp. 3d at 595 ("Claims under Section 15 hinge on the success of claims under

---

[22] And in any case, Centessa announced its "decision to discontinue clinical development for lixivaptan for ADPKD following a 'recent observation of [ALT] and [AST] elevations in one subject in the ALERT study.'"  FAC ¶ 80; *see also* Opp'n at 5 (stating that Centessa "announc[ed] that it would be discontinuing clinical development for Lixi based on reassessment of Lixi's commercial potential when the data from the ALERT Study indicated that Lixi would be unlikely to achieve a differentiated safety and tolerability profile than that of Tolvaptan").  Plaintiffs also do not allege that Centessa discontinued development for the drug due to any alleged enrollment issues.

Section[] 11 . . . , as Section 15 provides for liability of any person who, by or through stock ownership, agency, or otherwise, 'controls any person' found liable under Section[] 11 . . . ." (citing 15 U.S.C. § 77o)).

## V.    LEAVE TO AMEND

Defendants' motion to dismiss is granted with leave to amend as described below.  "The court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).

Here, any attempt to replead Statement No. 9 would be futile:  even when drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs failed to plead that any alleged misstatements or omissions contained within Statement No. 9, when read in context, are likely to have misled a reasonable investor.  *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997) (noting that leave to amend need not be granted where the proposed amendment would be futile).

Given the facts Plaintiffs pleaded in the complaint, read in conjunction with the Registration Statement as a whole, Statement Nos. 1, 2, 3, 4, 5, 6, 7, 8, 10, and 11 are inactionable for the reasons described above.  But the Court does not believe that an amendment with respect to these statements would be futile, for it is possible that Plaintiffs might amend their claims such that these statements are actionable on the basis of facts extrinsic to the Registration Statement.  Accordingly, the amended complaint is dismissed, without prejudice with respect to Statement Nos. 1, 2, 3, 4, 5, 6, 7, 8, 10, and 11.

Within twenty-one days, Lead Plaintiffs may file a second amended complaint to cure the deficiencies articulated in this opinion.  Lead Plaintiffs are not granted leave to expand the scope of the claims pleaded in the complaint.

## VI.    CONCLUSION

For these reasons, the Court finds that Plaintiffs have failed to adequately plead "the existence of either a misstatement or an unlawful omission" that was likely to "have misled a reasonable investor." *See In re Morgan Stanley*, 592 F.3d at 365–66 (citation and internal quotation marks omitted).  The Court grants Defendants' motion to dismiss without prejudice.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 71.

SO ORDERED.

Dated:  August 2, 2024
New York, New York

_____
GREGORY H. WOODS
United States District Judge

43